UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CARDIAC PACEMAKERS, INC., | ) | |
| GUIDANT SALES CORPORATION, | ) | |
| MIROWSKI FAMILY VENTURES, LLC, | ) | |
| and ANNA MIROWSKI, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CASE NO. 1:96-cv-1718-DFH-TAB |
| v. | ) | |
| | ) | |
| | ) | |
| ST. JUDE MEDICAL, INC., and | ) | |
| PACESETTER, INC., | ) | |
| | ) | |
| Defendants. | ) | |

ENTRY ON POST-REMAND MOTIONS FOR SUMMARY JUDGMENT

*Introduction*

This long-running patent infringement lawsuit is before the court on motions for summary judgment on the issues of infringement and anticipation. As explained in detail below, the court finds as a matter of law that defendants' devices infringe the one method claim still at issue. The court also finds as a matter of law that the remaining method claim, under the broader claim construction applied after the Federal Circuit's remand, is invalid as anticipated by the prior art. The court is entering final judgment for defendants.

Implantable cardiac defibrillators ("ICDs") are sophisticated electrical devices that can deliver life-saving therapy to correct dangerous and even fatal abnormal heart rhythms. Plaintiffs Cardiac Pacemakers, Inc., Guidant Sales Corporation, Mirowski Family Ventures, LLC, and Anna Mirowski (collectively, "CPI") sued defendants St. Jude Medical, Inc., and Pacesetter, Inc. (collectively, "St. Jude") in 1996 for infringing numerous claims of four United States patents relating to ICDs. Plaintiffs voluntarily dismissed claims under one patent before trial, and the court on summary judgment held invalid the relevant claims of another patent. The Federal Circuit affirmed that decision in an appeal of a partial final judgment on that issue. *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 296 F.3d 1106 (Fed. Cir. 2002).

In 2001, the case went to trial on four claims of the two remaining patents. The jury found that one patent (U.S. Patent No. 4,407,288) was valid but not infringed. The jury found that the other (U.S. Patent No. 4,316,472) was valid and infringed, and awarded CPI damages of $140 million. This court later granted judgment as a matter of law to St. Jude on all claims, including a finding that the relevant claims of the '288 patent were invalid as obvious in light of the prior art. *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 2002 WL 1801525 (S.D. Ind. 2002). To the court's surprise, CPI did not appeal the portion of the judgment setting aside the $140 million damage award on the '472 patent. Instead, CPI appealed primarily on the basis of a claim construction issue on one claim, claim

4, of the '288 patent that the jury found was not infringed, and appealed this court's finding of invalidity for obviousness, among several other issues.

The Federal Circuit affirmed in part and reversed in part. The Federal Circuit agreed that the construction of claim 4 needed a fresh look, though the Federal Circuit did not itself decide how the claim should be construed. The Federal Circuit remanded for reconsideration of the construction of the one claim and a new trial on that one claim. *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 381 F.3d 1371, 1381-82 (Fed. Cir. 2004). The Federal Circuit also held that this court erred in overturning the jury's finding that claim 4 of the '288 patent was valid and not obvious. *Id.* at 1378.

After remand, the parties staked out their positions in new claim construction briefs on claim 4, as well as a series of motions for summary judgment. The court construed claim 4 and addressed several other issues, but not all of the pending motions for summary judgment. *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 418 F. Supp. 2d 1021, 1031 (S.D. Ind. 2006). The Federal Circuit denied CPI's petition for a writ of mandamus, which had argued that this court was violating the Federal Circuit's mandate by leaving open for consideration on remand several issues pursued by St. Jude. *In re Cardiac Pacemakers, Inc.*, 183 Fed. Appx. 967 (Fed. Cir. June 2, 2006).[1]

---

[1]This case has actually been before the Federal Circuit four times. In addition to the three decisions cited in the text, the Federal Circuit held in *Cardiac* (continued...)

The parties then tried to settle the case.  On July 31, 2006, the parties announced an interesting partial settlement that substantially narrowed the issues and limited the potential damages.  See Remand Docket No. 181, Exs. A & B (SEC Form 8-K's).  Plaintiffs agreed not to pursue lost profits, agreed to cap any royalty at no more than three percent of net sales revenues from infringing sales, and agreed not to pursue prejudgment interest.  Defendants agreed not to pursue a fraud claim or an inequitable conduct defense based on certain alleged misconduct, and agreed not to pursue any claim for attorney fees.  The parties later informed the court that continued settlement negotiations had reached an impasse so that the court should return to the remaining summary judgment motions.  Each side filed a short statement commenting on the effects of the court's claim construction interpretation and their partial settlement on the issues presented by the motions.  Remand Docket Nos. 198 & 202.  More recent settlement efforts have also reached an impasse.  The court now addresses the pending motions as follows.

I.    *Infringement Issues*

The court's March 1, 2006 claim construction ruling on remand narrowed the issues on infringement considerably.  The undisputed facts before the court

---

[1](...continued)
*Pacemakers, Inc. v. St. Jude Medical, Inc.*, 144 Fed. Appx. 106 (Fed. Cir. 2005), that Seventh Circuit Rule 36 did not apply so as to require that the case be assigned to a new district judge for the new trial.  In light of the parties' failure to reach a complete settlement, at least one more visit to the Federal Circuit seems likely.

show that the accused St. Jude devices perform all steps of the '288 patent's claim 4 method when the devices actually carry out the form of therapy known as "cardioversion" (as distinct from both pacing therapy and defibrillation). In other words, plaintiffs are entitled to partial summary judgment on that question. St. Jude has had ample opportunity to distinguish the operation of its devices from the newly-construed version of claim 4, and it has not done so. CPI's motion for summary judgment on infringement is granted to the extent that the actual operation of those devices to deliver cardioversion therapy infringes claim 4.

That finding does not go so far as to hold defendants liable for infringement, however. CPI's decision to limit its case now to the claim 4 method means that CPI must show such actual use of the St. Jude devices, see 418 F. Supp. 2d 1041-42, and it must show that St. Jude induced any infringement that might be shown. Those are issues as to which neither side has shown it is entitled to summary judgment.[2]

CPI has also asked the court to rule on a question that may be relevant to damages. The issue is whether St. Jude had available to it a non-infringing alternative design under U.S. Patent No. 4,880,005, a patent for an ICD device

_____

[2]St. Jude has recently filed an additional motion for summary judgment based on the Federal Circuit's decision in *DSU Medical Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006), holding that a claim for knowing inducement of patent infringement by another under 35 U.S.C. § 271(b) requires proof of specific intent to infringe. That motion has not yet been briefed. In light of the court's decision on the anticipation defense discussed below, the court does not reach the specific intent issue.

that would have had the capacity to learn from its experience in treating arrhythmias. Claim 4 of the '288 patent requires the step of "selecting at least one mode of operation of the implantable heart stimulator which operation includes a unique sequence of events corresponding to said determined condition." Under the '005 patent, the device's choice of therapy would depend on the patient's history with the device. For example, a device might be programmed initially to respond to a certain form of ventricular tachycardia (rapid heart rate) with pacing shocks, to be followed by more powerful cardioverting shocks if the pacing is not successful. But the device could also be programmed to respond to the second or later similar episodes of tachycardia by skipping the previously unsuccessful therapy of pacing shocks and going straight to the cardioverting shocks. Defendants argue that a device programmed in this manner to learn from its experience in treating a patient's condition does not provide "a *unique* sequence of events corresponding to said determined condition," as required by claim 4 of the '288 patent.

CPI argues that this question is too hypothetical at this stage and that there are issues of fact as to whether the '005 form of programming was in fact available to St. Jude during the period of alleged infringement. The court agrees with CPI that the issue is not yet suitable for a definitive ruling on summary judgment. There are disputed factual issues as to whether and exactly when a design under the '005 patent would have been available to St. Jude.

Accordingly, CPI's motion for summary judgment on infringement (Remand Docket No. 72) is granted to the extent that any proven actual use of the St.Jude devices for cardioversion therapy infringes claim 4 as a matter of law.   CPI's motion is denied in other respects, without reaching the specific intent issue raised recently.   St. Jude's motion for summary judgment on the issue of infringement (Remand Docket No. 85) is also denied.

## II.   *Anticipation*

A patent claim is invalid as anticipated if every limitation in a claim is found in a single prior art reference, either explicitly or inherently.  See *Schering Corp. v. Geneva Pharmaceuticals, Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003) (affirming summary judgment of invalidity based on anticipation); *MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999) (same).  The first step of an anticipation analysis is claim construction; the second step is a comparison of the construed claim to the prior art.  *Helifix, Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1346 (Fed. Cir. 2000).   Anticipation must be shown by clear and convincing evidence.  *Id.*  To be anticipating, a prior art reference must disclose "each and every limitation of the claimed invention[,] . . . must be enabling[,] and [must] describe . . . [the] claimed invention sufficiently to have placed it in possession of a person of ordinary skill in the field of the invention."  *Id.*  This court has already construed claim 4 of the '288 patent.

St. Jude has moved for summary judgment (Remand Docket No. 80) on the ground that claim 4 of the '288 patent is invalid as anticipated by at least two prior art references based on work done by Medtronic scientists in the 1970s. (Medtronic Corporation is another major competitor in the ICD field.)  As the history of this case has shown in painstaking detail, by the time the research was done that led to the application for the '288 patent, the field of implantable cardiac defibrillators was what might be called a "crowded art."  Whether the applicants could thread their way through the prior art to find something truly novel presented quite a challenge.

A.     *Ability to Consider Anticipation*

As a threshold matter, CPI argues that claim 4 could not possibly have been anticipated, and that the issue is no longer even open for debate, because the Federal Circuit reversed this court's earlier judgment as a matter of law to the effect that claim 4 was invalid as obvious.  See 381 F.3d at 1378.  At first glance, of course, it seems that if the invention of the claim was not obvious under the prior art, it also could not be invalid for anticipation.

CPI's arguments on this point fail to take into account the critical role that the revised claim construction plays.  The Federal Circuit's opinion explicitly opened the door to consideration of validity issues, at least to the extent they were based on a revised construction of claim 4.  See 381 F.3d at 1382-83 (agreeing with St. Jude's argument that modified claim construction would require a new

trial so that St. Jude could present evidence and arguments not needed under original claim construction, such as whether the claim is supported by the specification).   In denying CPI's petition for a writ of mandamus, the Federal Circuit wrote about its prior decision:

> To the extent that our opinion may not, despite our attempts, have been sufficiently clear, we repeat that we "remand[ed] for a new trial of infringement and reassessment of damages," *Cardiac Pacemakers*, 381 F.3d at 1374, including reconstruction by the district court of the "determining" provision in light of our ruling that section 112 ¶ 6 did not apply, *Id.* at 1382.  We also recognized that a new claim construction may raise directly related new issues, "such as whether the now-asserted scope of the claims is supported by the specification," *Id.* at 1383.

> All the other issues on appeal were finally decided, and are not subject to reopening on remand.

183 Fed. Appx. 967.

This court would not and could not revisit the issue of obviousness as decided by the Federal Circuit.   However, the revised construction of claim 4 advocated by CPI and adopted by this court has substantially broadened the scope of the claim.   The earlier construction had meant that claim 4 covered only methods that determine a condition of the heart by evaluating both the heart rate and what was described as a probability density function, or "PDF."  As a result, some of the relevant prior art was readily distinguishable from claim 4 under this court's earlier construction, based on the absence of PDF in the determining step.

The revised construction sought by plaintiffs eliminates that limitation in terms of how the condition of the heart is determined.   418 F. Supp. 2d at 1028-

30.   Claim 4, properly construed after the Federal Circuit's remand, covers methods that use a wide variety of methods to determine the condition of the heart, including methods that measure only the heart rate.  Under the broader construction of claim 4, this court respectfully concludes that the anticipation defense is, in the words of the Federal Circuit, a "directly related new issue."  By successfully arguing for a broader construction of claim 4, CPI has opened the door for St. Jude to try to show that prior art in fact included *all* the elements of claim 4.  If an item of prior art in fact shows all the elements of claim 4, then one need not address the more complex issues involved in the question of obviousness, such as those addressed at an earlier stage.[3]

B.    *Claim 4 of the '288 Patent*

Before delving into the details of the prior art, it is worth recalling that the issue here is not whether some aspects of the '288 patent were novel and useful.  Nor is the issue whether the inventors and the patent made an important contribution to the development of more sophisticated and effective ICDs.  The plaintiffs have chosen to hang all that remains of their case on *just one claim*,

---

[3]For example, where the prior art "teaches away" from the invention claimed in the new patent, that fact will be highly relevant to the issue of obviousness.  See *Cardiac Pacemakers, Inc.*, 381 F.3d at 1377 (in discussion of obviousness issue, citing evidence that Duggan '870 "teaches away from use of a high-energy shock"). In considering the issue of anticipation, however, if the prior art discloses all the elements of the newly-claimed invention, the fact that the prior art might "teach away" from the new invention does not matter.  *E.g.*, *Upsher-Smith Laboratories, Inc. v. Pamlab, LLC*, 412 F.3d 1319, 1323 (Fed. Cir. 2005).

claim 4, so the focus must remain on whether *just that claim* represents a novel invention.

> Claim 4 of the '288 patent, including Claim 1 from which it depends, claims:
>
> 1.  A method of heart stimulation using an implantable heart stimulator capable of detecting a plurality of arrhythmias and capable of being programmed to undergo a single or multi-mode operation to treat a detected arrhythmia, corresponding to said mode of operation the method comprising the steps of:
> (a) determining a condition of the heart from among a plurality of conditions of the heart;
> (b) selecting at least one mode of operation of the implantable heart stimulator which operation includes a unique sequence of events corresponding to said determined condition; and
> (c) executing said at least one mode of operation of said implantable heart stimulator thereby to treat said determined heart condition.
>
> 4.  The method of claim 1, wherein said at least one mode of operation of said implantable heart stimulator includes cardioversion.

'288 patent, col. 21:9-32.

C.    *Denniston '795*

As properly construed now, the undisputed facts show that claim 4 of the '288 patent was anticipated by United States Patent No. 3,805,795, issued to Rollin H. Denniston on April 23, 1974.

Denniston '795 described an implantable electronic system that detects any of a variety of arrhythmias and automatically cardioverts the heart.  Def. Ex. 23, col. 2:59 – col. 3:16.  The device was capable of delivering both cardioverting

shocks and the lower energy pacing shocks.  See *id.* at col. 4:24-27 (intravascular lead can also be used to sense heart conditions and to transmit pacing pulses to the heart).

Working through the elements of claim 4 of the '288 patent, the first element is a "method of heart stimulation using an implantable heart stimulator." Denniston '795 clearly meets that element:  "the system including both electrodes may be totally and completely implanted under the skin of the patient."  Ex. 23, col. 3:12-14.

The next element is that the stimulator is "capable of detecting a plurality of arrhythmias."  The Denniston device is capable of detecting bradycardia (slow heart rate) that requires pacing pulses.  Ex. 23, col 4:24-27; col. 7:26-32 (R wave amplifier operates in same manner as those commonly used in demand pacer for heart, adapted to discriminate between normal and abnormal heart functions). The Denniston device is also capable of detecting ventricular tachycardia and ventricular fibrillation and other types of tachyarrhythmias.  Col. 3:6-11; col. 3:36-51.  Denniston also described other means for using the system to detect and discriminate among other types of arrhythmias.  Col. 19:32-42.

The next element of claim 4 is that the device must be "capable of being programmed to undergo a single or multi-mode operation to treat a detected arrhythmia."  As to multi-mode operation, the intravascular lead that is used to

deliver cardioversion shocks "is also capable of being used for sensing heart conditions requiring heart pacing and for transmitting pacing pulses to the heart." Col. 4:24-27.  The cardioversion therapy could be delivered only after a normal heart rate is absent for a pre-set period of time, on the order of 15 to 20 seconds, col. 3:65-67, during which time pacing pulses could first be applied.  The Denniston device therefore is capable of multi-mode operation.  As to single-mode operation, the lead that could be used to transmit pacing pulses could also be instructed not to deliver such pulses, so that only the single mode of cardioversion would be available to treat an arrhythmia.  As Dr. Mihran testified at the 2001 trial:  "if one were to have Denniston implanted and wanted the single mode of operation only, then the pacing function could be turned off.  So that would be a single mode operation.  If it was left on, then it would perform the multi-mode operation then."  Tr. 3166-67 (June 28, 2001); see also *Cardiac Pacemakers, Inc.*, 2000 WL 1765358, *29 (claim construction ruling explaining that programming for multi-mode operation also allows for programming for single-mode operation). The Denniston device is capable of being programmed to deliver only pacing therapy, also.  If pacing pulses restore normal heart operation, then the device will not deliver cardioversion shocks.  Col. 3:53-55.

The next element of claim 4 is the step of "(a) determining a condition of the heart from among a plurality of conditions of the heart."  As noted above, the Denniston device is capable of distinguishing among different arrhythmias.  It also performs the determining step by detecting, for example, the absence of a

heartbeat using an EKG sensor and a heart contraction sensor, col. 3:36-51, and also determining when a normal heartbeat is restored after delivery of therapy.

The next element of claim 4 of the '288 patent is the step of "(b) selecting at least one mode of operation of the implantable heart stimulator which operation includes a unique sequence of events corresponding to said determined condition." The Denniston device also performs this step. For example, if the device senses the absence of a heartbeat, the Denniston device can select pacing pulses alone, pacing pulses followed by cardioversion if needed, or only cardioversion. See Col. 3:52 – 4:7; col. 4:24-27; Tr. 2975-77, 2990, 3125-26, 3163-67.

The next element of claim 4 of the '288 patent is the step of "executing said at least one mode of operation of said implantable heart stimulator thereby to treat said determined heart condition." The Denniston device carries out the executing step by actually delivering the selected therapy in response to the detected arrhythmia, such as by delivering pacing pulses and/or cardioversion shocks.

The Denniston '795 patent thus discloses all elements of claim 1 of the '288 patent. Claim 4 requires the additional element that "at least one mode of operation of said implantable heart stimulator includes cardioversion." The Denniston device also includes the cardioversion mode of operation, teaching the

use of a first cardioversion shock of 700 volts, for example, followed by a stronger shock of 900 volts if the first shock does not restore a normal rhythm.  Col. 18:39 – 19:15.

In its opening brief for summary judgment on anticipation, St. Jude showed in detail how each of these elements was taught in Denniston.  In arguing against a finding of anticipation on the merits, CPI argued in its brief only that Denniston did not describe an "externally programmable" device.   CPI relies on trial testimony from Dr. Mihran, an expert for St. Jude:

Q:     Denniston can't be programmed externally, correct?

A:     Denniston does not describe a programming operation, that's correct.

Tr. 3163.  The question was specific to external programming.  Claim 4 of the '288 patent is not so limited to only external programming.  The question and answer therefore do not present a genuine issue of material fact that would bar summary judgment.

Denniston '795 clearly shows a device that is programmable for different levels of cardioversion energy.  Denniston explained:  "The resistive values of transistors 466, 468 and 474 may be selected, so that the electrical line 35 voltage required to render PUT [programmable unijunction transistor] 470 conductive is 700 volts when transistor 478 is nonconductive, and 900 volts when transistor 478 is conductive."  Col. 14, ll. 30-34.  In columns 18 and 19, Denniston

-15-

described the operation of the device to provide first a 700 volt pulse and then if needed a second and even third pulse at 900 volts.

At the hearing on the anticipation motion for summary judgment, CPI raised a host of new arguments regarding Denniston for the first time.  CPI argued that the "capable of being programmed" limit in claim 1 is limited to *external* programming.  This argument was made too late, and is without merit in any event.  In this respect, claim 1 was drafted broadly, without this additional limitation of being externally programmed.  In fact, the '288 patent claims were drafted so as to distinguish between the broader "programming" and the narrower, more specific "external programming."  Dependent claim 7, which is also dependent on claim 1, adds to the claimed method the further step of "*externally programming said microprocessor-controlled implantable stimulator with respect to said at least one mode of operation thereof.*"  (Emphasis added.)

In light of this careful drafting, it would be a mistake to graft onto the deliberately broader language of claim 1 the additional limitation that the method would need to include external programming.  Courts construing patents presume that there is "a difference in meaning and scope when different words or phrases are used in separate claims."  *E.g.*, *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998); see also *Cardiac Pacemakers*, 2000 WL 1765358, *16 (adopting CPI's argument for claim differentiation), citing *Karlin Technology, Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 972 (Fed. Cir. 1999)

("limitations stated in dependent claims are not to be read into the independent claim from which they depend").  CPI points out correctly that the principle of claim differentiation is not inflexible, citing *Power Mosfet Technologies, L.L.C. v. Siemens AG*, 378 F.3d 1396, 1409-10 (Fed. Cir. 2004); see also *Comark Communications*, 156 F.3d at 1187 (rule is not "hard and fast"), but in light of the critical role of claim language, the principle of claim differentiation remains an essential tool for all but the most unusual cases.

Throughout the long history of this case, CPI has repeatedly argued against the error of narrowing broad claim language by reading in limitations from the specification, such as limiting broad claims of the '472 patent to only the atrial conditions addressed in the specification, limiting cardioversion to the manual cardioversion in the specification, or limiting the determining step of the '288 patent to use of the PDF method in the specification.  See 418 F. Supp. 2d at 1029; 2000 WL 1765358, *4-6, *14.  The use of the broad term "programmed" in claim 1 did not create an ambiguity requiring clarification.  Instead, the use of that broad term reflected a deliberate decision to draft a broad independent claim, which then became the foundation for a host of narrower and more specific dependent claims, including claim 7, which expressly required external programmability.

At the hearing, CPI also sought improperly to raise a number of other issues regarding Denniston for the first time. CPI's brief in opposition to summary

-17-

judgment on anticipation asserted at page 1: "Plaintiffs dispute alleged facts in numbered paragraphs C1, C4, C7, C14, D1-D3, D5-15, E1-E3, and E5-E10 in St. Jude's brief." Docket No. 121 at 1, ¶ 1. The only other specific point that CPI raised to dispute any of the "C" paragraphs (which address the Denniston '795 patent) was the quoted question and answer from Dr. Mihran at trial on the issue of external programming.

CPI's conclusory assertion that it disputed the listed paragraphs was not sufficient to present a genuine issue of material fact. This court's Local Rule 56.1 includes requirements for a party's opposition to summary judgment:

> The brief shall include a section labeled "Statement of Material Facts in Dispute" which responds to the movant's asserted material facts by identifying the potentially determinative facts and factual disputes which the nonmoving party contends demonstrate that there is a dispute of fact precluding summary judgment. These facts shall be supported by appropriate citations to discovery responses, depositions, affidavits, and other admissible evidence either already in the record or contained in an appendix to the brief.

S.D. Ind. Local Rule 56.1(b). Local Rule 56.1(e) further provides in relevant part:

> For purposes of deciding the motion for summary judgment, the Court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts: are specifically controverted in the opposing party's "Statement of Material Facts in Dispute" by admissible evidence. . . . * * * The court has no independent duty to search and consider any part of the record not specifically cited in the manner described in sections (a) and (b) above.

Summary judgment practice has become such a big part of federal civil practice that compliance with these procedural requirements, and in particular the requirement to guide the court toward the specific evidence and issues requiring a trial, has become essential for district courts trying to manage their dockets.  The Seventh Circuit has repeatedly upheld the enforcement of this court's Local Rule 56.1 and similar local rules used to manage summary judgment practice by ensuring that issues are presented clearly and squarely, without leaving the district court to wander through the record in search of the evidence the non-moving party might be relying upon.  Among many examples that could be cited, see, *e.g.*, *Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004) (affirming summary judgment, collecting many cases on this point, and finding that district court properly struck attempts to raise factual disputes without specific citations to evidence:  "Citations to an entire transcript of a deposition or to a lengthy exhibit are not specific and are, accordingly, inappropriate.  A court should not be expected to review a lengthy record for facts that a party could have easily identified with greater particularity."); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) (affirming summary judgment where non-moving party failed to support factual assertions with specific citations to evidence:  "A district court is not required to 'wade through improper denials and legal argument in search of a genuinely disputed fact.'"), quoting *Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000); *Brasic v. Heinemann's, Inc.*, 121 F.3d 281, 285 (7th Cir. 1997) (affirming summary judgment:  "It is not our task, or that of the district court, to scour the record in

search of a genuine issue of triable fact.  We rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment."), quoting *Richards v. Combined Ins. Co. of America*, 55 F.3d 247, 251 (7th Cir. 1995); *Herman v. Chicago*, 870 F.2d 400, 404 (7th Cir. 1989) ("A district court need not scour the record to make the case of a party who does nothing."); see also *Corley v. Rosewood Care Center, Inc.*, 388 F.3d 990, 1001 (7th Cir. 2004) (enforcing parallel requirement for citations to record in appellate briefs:  "Corley has failed miserably and we will not root through the hundreds of documents and thousands of pages that make up the record here to make his case for him.").

St. Jude properly supported its motion for summary judgment on anticipation with specific and detailed arguments supported by specific and detailed citations to the relevant evidence.  The conclusory and unsupported list in CPI's brief of the paragraphs that it disputed was not sufficient to preserve any issue.  A "mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material."  *Smith v. Lamz*, 321 F.3d at 683, citing *Edward E. Gillen Co. v. City of Lake Forest*, 3 F.3d 192, 196 (7th Cir. 1993).  The only argument that CPI developed on the merits was the argument that Denniston '795 was not programmable, supported only by the evidence that it was not externally programmable, which is beside the point for reasons explained above.

At the hearing on February 13, 2007, CPI argued for the first time that Denniston '795 is not programmable for multi-mode operation, that it does not provide multi-mode operation, and that it does not provide a unique sequence of therapy for a selected arrhythmia. These arguments were not raised at all in CPI's brief. It is not fair to St. Jude or to the court to present them orally for the first time at the hearing on the motion, and without complying with this court's Local Rule 56.1(b). The court does not consider these forfeited arguments.[4]

D.   *Duggan '870*

Duggan '870 is United Kingdom Patent Application 2,026,870. Duggan '870 described an implantable cardiac stimulator controlled by a microprocessor. It was capable of delivering pacing-level shocks to single sites in the atrium and ventricle in sequence. That therapy could be followed by simultaneous delivery of pacing-level shocks to multiple sites in the heart muscle. Dr. Mihran described such simultaneous pacing-level shocks as a form of cardioversion. Other prior art from Medtronic also described the same therapy – simultaneous delivery of pacing-level shocks to multiple sites in the heart muscle – as "cardioversion." See Rockland '140 (Def. Ex. 27, col. 1, ll. 41-68); Funke '226 (Ex. 28).

---

[4]To illustrate further the problems with CPI's response to the motion for summary judgment, CPI announced at the hearing that its statement that it disputed "paragraphs C1, C4, C7, C14" relevant to Denniston '795 included a typographical error, and that it should have said it disputed "paragraphs C1, C4, C7 *through* C14." Because CPI failed to provide specific support for its attempt to dispute any of these paragraphs, apart from the external programming theory, St. Jude and the court had no other sign before the hearing that CPI was attempting to dispute paragraphs C8 through C13.

In its motion for summary judgment, St. Jude explained in detail in Paragraphs D4 through D12 how Duggan '870 taught all elements of the method of claim 4 of the '288 patent. CPI's response brief stated without elaboration that it disputed paragraphs "D1-D3, D5-15" relating to Duggan. As explained above, such a conclusory and unsupported response does not properly raise any issue of material fact. A "mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material." *Smith v. Lamz*, 321 F.3d at 683.

The only specific issue that CPI raised regarding Duggan was whether it taught "cardioversion," citing specifically the trial testimony of defense experts Dr. Mihran and Dr. Rickards. During the 2001 trial, Dr. Mihran acknowledged on cross-examination that the energy levels described in Duggan '870 were the lower levels associated with pacing rather than cardioversion. Tr. 3134-36. He did not concede that Duggan '870 failed to teach cardioversion. His answer that was specific to the energy levels was consistent with Dr. Mihran's description of Duggan '870 as teaching a form of cardioversion. And his answer certainly cannot erase the undisputed fact that the prior art described the Duggan '870 therapy as a form of cardioversion. See *Cardiac Pacemakers, Inc.*, 381 F.3d at 1377 ("Duggan discusses cardioversion achieved by application not of a single large shock, as in the '288 patent, but by a combination of small pacing shocks delivered simultaneously to multiple sites on the heart.").

CPI also relies on Dr. Rickards' testimony at trial. He agreed that Duggan '870 did not have the element of a cardioverter. Tr. 1955-56. He also answered a negative question that produced an ambiguous answer:

Q:    Duggan is not a cardioverter?

A:    No.

*Id.*

Does this produce a genuine issue of material fact? The prior art described the Duggan '870 method of multiple simultaneous pacing-level shocks as "cardioversion." There is no indication in the '288 patent that the term cardioversion in claim 4 was used in any narrow or specialized way that would exclude the Duggan/Medtronic form of cardioversion through multiple simultaneous shocks. (One might only consider the possibility of the shoe being on the other foot. If the '288 patent had issued before the Duggan '870 patent, and if CPI were accusing someone who was practicing the Duggan '870 invention of infringing the '288 patent, the argument that the multiple pacing-level shocks described in the prior art as cardioversion was not "cardioversion" under the '288 patent would not have much traction.)

Accordingly, the only specific issue raised by CPI presents no genuine issue of material fact. Duggan '870 anticipated claim 4 of the '288 patent by disclosing every element of claim 4.

*Conclusion*

In an effort to pursue its infringement claims through this "crowded art," CPI ultimately chose to rest its case on only claim 4 of the '288 patent.  The undisputed facts show that St. Jude's accused devices infringe that claim when they are actually used to deliver the therapy of cardioversion.  CPI is entitled to summary judgment on that issue.  The undisputed facts also show, however, that both Denniston '795 and Duggan '870 anticipated the broader claim 4 as newly construed on remand from the Federal Circuit.  The court therefore grants St. Jude's motion for summary judgment on the ground of anticipation (Docket No. 80).  All other pending motions not addressed specifically in this entry are denied as moot.  The court will enter final judgment for defendants accordingly.


So ordered.


Date:  March 26, 2007

_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Frederick Brown
GIBSON DUNN & CRUTCHER LLP
fbrown@gibsondunn.com

Barry J. Herman
OBLON SPIVAK McCLELLAND MAIER & NEUSTADT P.C.
bherman@oblon.com

J. Michael Jakes
FINNEGAN HENDERSON FARABOW GARRETT & DUNNER
mike.jakes@finnegan.com

H. Mark Lyon
GIBSON DUNN & CRUTCHER LLP
mlyon@gibsondunn.com

Richard R. McDowell
HILL FULWIDER MCDOWELL FUNK & MATTHEWS
dick@hfmfm.com

Michael T. McNally
ICE MILLER LLP
mcnally@icemiller.com

Thomas Eugene Mixdorf
ICE MILLER LLP
thomas.mixdorf@icemiller.com

Michael Andre Morin
FINNEGAN HENDERSON FARABOW GARRETT & DUNNER LLP
michael.morin@finnegan.com

Daniel Pierre Muino
GIBSON DUNN & CRUTCHER LLP
dmuino@gibsondunn.com

Michael Vincent O'Shaughnessy
FINNEGAN HENDERSON FARABOW GARRETT & DUNNER LLP
oshaughm@finnegan.com

Jeffrey M. Olson
SIDLEY AUSTIN LLP
jolson@sidley.com

Denis R. Salmon
GIBSON DUNN & CRUTCHER LLP
dsalmon@gibsondunn.com

John R. Schaibley III
BAKER & DANIELS
jrschaib@bakerd.com

David A. Segal
GIBSON DUNN & CRUTCHER LLP
dsegal@gibsondunn.com

Robert K. Stanley
BAKER & DANIELS
rkstanle@bakerd.com

Kara Farnandez Stoll
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
kara.stoll@finnegan.com

Jay G. Taylor
ICE MILLER LLP
jay.taylor@icemiller.com

Philip A. Whistler
ICE MILLER LLP
philip.whistler@icemiller.com